**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

JENNIFER PEAT, JEFFERSON MEIGHAN JR.,    :    **INDEX NO. 12cv8230**
ELAN COHEN, DALLAS CARTER, GARRETT    :    **(SAS)(HP)**
O'CONNOR, BRENDON SULLIVAN-MONSON,    :    **ECF CASE**
CHRISTOPHER BRANNON, ATHENA SOULES,    :
SAMANTHA ALLEGRA FRIERSON, ZACHARY    :
CUNNINGHAM, MATTHEW BOLAND, NEGESTI    :    **JURY TRIAL DEMANDED**
CANTAVE, ELIZABETH ARCE, and OSCAR    :
WHELAN,    :

                        Plaintiffs,    :    **FIRST AMENDED**
    :    **COMPLAINT**

       - against -    :

THE CITY OF NEW YORK, a municipal entity,    :
CHIEF OF PATROL JAMES P. HALL,    :
DEPUTY INSPECTOR DANIEL MULLIGAN,    :
CAPTAIN WILLIAM GARDNER, CAPTAIN    :
WILLIAM TAYLOR, LIEUTENANT    :
BESSLER, SERGEANT AMBER CAFARO,    :
SERGEANT MATTHEW FERRIGNO,    :
SERGEANT VINCENT GIAMBRONE,    :
SERGEANT JOSEPH MILLER, SERGEANT    :
ADAM TORRES, POLICE OFFICER    :
MATTHEW BREHM, POLICE OFFICER    :
ODED ELIAV, POLICE OFFICER JEFFREY    :
FITTERMAN, POLICE OFFICER JESSICA    :
GALVIN, POLICE OFFICER SAUL    :
GUZMAN, POLICE OFFICER KONTARINIS,    :
POLICE OFFICER DAVID LAURIA, POLICE    :
OFFICER TANYA MONROE, POLICE    :
OFFICER CHRISTOPHER PERKINS, POLICE    :
OFFICER OSCAR POLANCO, and "John Doe"
POLICE OFFICERS 1-30,

                      Defendants.
------------------------------------------------------------------------X



      Plaintiffs JENNIFER PEAT, JEFFERSON MEIGHAN JR., ELAN COHEN,

DALLAS CARTER, GARRETT O'CONNOR, BRENDON SULLIVAN-MONSON,

CHRISTOPHER BRANNON, ATHENA SOULES, SAMANTHA ALLEGRA

1

FRIERSON, ZACHARY CUNNINGHAM, MATTHEW BOLAND, NEGESTI CANTAVE, ELIZABETH ARCE, and OSCAR WHELAN  (henceforth, unless otherwise described, "Plaintiffs"), by their attorney, DAVID A. THOMPSON, Esq. of STECKLOW COHEN AND THOMPSON, complaining of the defendants, respectfully allege as follows, upon information and belief:

## I.   PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by said statutes of the Constitutions of the State of New York and the United States.  The Plaintiffs were each peaceful and law-abiding individuals expressing support for the Occupy Wall Street movement, and protesting the institutionalized inequality in this country that funnels almost all the nation's political power, wealth and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans their fair share.  At the intersection of 13th Street and Second Avenue in Manhattan, the Plaintiffs were trapped within a net of NYPD police officers and vehicles, and unlawfully arrested for expressing their views.

## II.    JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

**3.** Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally-based claims and causes of action.

### III.   VENUE

**4.** Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b) because the claims arose in this district.

### IV.   JURY DEMAND

**5.** Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V.   THE PARTIES

**6.** At all times relevant, each of the Plaintiffs, JENNIFER PEAT, JEFFERSON MEIGHAN JR., ELAN COHEN, DALLAS CARTER, GARRETT O'CONNOR, BRENDON SULLIVAN-MONSON, CHRISTOPHER BRANNON, ATHENA SOULES, SAMANTHA ALLEGRA FRIERSON, ZACHARY CUNNINGHAM, MATTHEW BOLAND, NEGESTI CANTAVE, ELIZABETH ARCE, and OSCAR WHELAN were citizens of the United States.

**7.** Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.  Defendant THE CITY OF NEW YORK maintains the New York City Police Department (the "NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections

of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, Defendant THE CITY OF NEW YORK.

8.      At all times relevant to this action, the individually named Defendant CHIEF OF PATROL JAMES P. HALL ("Defendant CHIEF HALL") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

9.      At all times relevant to this action, the individually named Defendant DEPUTY INSPECTOR DANIEL MULLIGAN ("Defendant DEPUTY INSPECTOR MULLIGAN") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

10.      At all times relevant to this action, the individually named Defendant CAPTAIN WILLIAM GARDNER ("Defendant CAPTAIN GARDNER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

11.      At all times relevant to this action, the individually named Defendant CAPTAIN WILLIAM TAYLOR ("Defendant CAPTAIN TAYLOR") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

12.      At all times relevant to this action, the individually named Defendant LIEUTENANT BESSLER was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

13.     At all times relevant to this action, the individually named Defendant SERGEANT AMBER CAFARO ("Defendant SERGEANT CAFARO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties.

14.     At all times relevant to this action, the individually named Defendant SERGEANT MATTHEW FERRIGNO ("Defendant SERGEANT FERRIGNO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

15.     At all times relevant to this action, the individually named Defendant SERGEANT VINCENT GIAMBRONE ("Defendant SERGEANT GIAMBRONE") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

16.     At all times relevant to this action, the individually named Defendant SERGEANT JOSEPH MILLER ("Defendant SERGEANT MILLER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

17.     At all times relevant to this action, the individually named Defendant SERGEANT ADAM TORRES ("Defendant SERGEANT TORRES") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

18.     At all times relevant to this action, the individually named Defendant POLICE OFFICER MATTHEW BREHM ("Defendant POLICE OFFICER BREHM")

was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

19.     At all times relevant to this action, the individually named Defendant POLICE OFFICER ODED ELIAV ("Defendant POLICE OFFICER ELIAV") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

20.     At all times relevant to this action, the individually named Defendant POLICE OFFICER JEFFREY FITTERMAN ("Defendant POLICE OFFICER FITTERMAN") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

21.     At all times relevant to this action, the individually named Defendant POLICE OFFICER JESSICA GALVIN ("Defendant POLICE OFFICER GALVIN") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties.

22.     At all times relevant to this action, the individually named Defendant POLICE OFFICER SAUL GUZMAN ("Defendant POLICE OFFICER GUZMAN") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

23.     At all times relevant to this action, the individually named Defendant POLICE OFFICER KONTARINIS was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

**24.**     At all times relevant to this action, the individually named Defendant POLICE OFFICER DAVID LAURIA ("Defendant POLICE OFFICER LAURIA") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

**25.**     At all times relevant to this action, the individually named Defendant POLICE OFFICER TANYA MONROE ("Defendant POLICE OFFICER MONROE") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties.

**26.**     At all times relevant to this action, the individually named Defendant POLICE OFFICER CHRISTOPHER PERKINS ("Defendant POLICE OFFICER PERKINS") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

**27.**     At all times relevant to this action, the individually named Defendant POLICE OFFICER OSCAR POLANCO ("Defendant POLICE OFFICER POLANCO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

**28.**     At all times relevant to this action, each of the Defendant "John Doe" POLICE OFFICERS 1-30 were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

**29.**     Hereinafter, the persons named as defendants and described in paragraphs 8 though 27 above will be referred to collectively as the "Individual Defendants" and, collectively with Defendant "John Doe" POLICE OFFICERS 1-30, as the "Police Officer Defendants."  Those Individual Defendants holding a rank of Sergeant, Lieutenant,

Captain, Deputy Inspector or Chief of Patrol will referred to collectively as the "Ranking Officer Defendants."

30. Plaintiffs will amend this complaint to name the Defendant "John Doe" POLICE OFFICERS 1-30 as further information regarding their identities become available to Plaintiff.

31. At all times hereinafter mentioned, the Ranking Officer Defendants had the authority to supervise other, lower-ranked Defendant Police Officers at the scene of the arrests of the Plaintiffs, and the Ranking Officer Defendants exercised that authority in a manner that caused the violations of the Plaintiffs' rights pled herein.

32. In the alternative, at all times hereinafter mentioned, the Ranking Officer Defendants had the authority to supervise other, lower-ranked Defendant Police Officers at the scene of the arrests of the Plaintiffs, and the Ranking Officer Defendants failed to exercise that authority in such manner as to prevent the Defendant Police Officers from violating the rights of the Plaintiffs as pled herein.

33. At all times relevant to this action, each of the Defendant POLICE OFFICERS were acting under color of state law and/or in compliance with the rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

34. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope of their employment by Defendant THE CITY OF NEW YORK.

35. At all times hereinafter mentioned, the Defendant POLICE OFFICERS JOHN DOES were duly sworn police officers of said department and were acting under

the supervision of said department and according to their official duties. Plaintiffs sue these Defendants as well as the Individual Defendants in both their individual and official capacities.

36.     At least thirty days have elapsed since the demand, claims upon which this action is founded were presented to a director or officer of Defendant THE CITY OF NEW YORK and the CITY has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.

37.     Pursuant to New York General Municipal Law § 50-e *et seq.*, at least 30 days have elapsed since the service of notices of claim, and adjustment or payment thereof has been has been neglected or refused.

## VI.   FACTS COMMON TO ALL CLAIMS

38.     Occupy Wall Street (also referred to herein as "Occupy") is a popular political movement that seeks, among other things, to bring greater fairness to the way in which power and resources are shared among citizens of the United States.

39.     Occupy Wall Street consists of a large number of people nationwide who share a common consensus that American society is structured in a way that unfairly benefits the rich and powerful at the expense of ordinary people.

40.     Negative consequences of this structure include income inequality, poverty, mass imprisonment of citizens, offensive wars, environmental degradation, taxpayers paying for the mistakes of reckless corporations, and undue influence of corporations on government.

41.     Those involved with Occupy Wall Street share the belief that change is possible through peaceful protest.

42.     The Occupy Wall Street movement began to take action on September 17, 2011, by beginning a protest-occupation of Zuccotti Park, located in New York City's Wall Street financial district. Occupy Wall Street-related protests sprang up in many other cities throughout the United States, and the world.  A group of protestors remained at that location until November 15, 2011, when they were forcibly ejected during a 1AM police raid, accompanied by mass arrests of protestors and journalists.

43.     The Plaintiffs were participants in the Occupy Wall Street movement.

44.     On the night of December 31, 2011-January 1, 2012, some participants in the Occupy Wall Street movement gathered at Zuccotti Park to show their support for the movement and its ideas.

45.     At approximately 12:30 AM on January 1, 2012, some of those present at Zuccotti Park began to leave en masse, expressing their support for the Occupy Wall Street movement, including some of the Plaintiffs.

46.     The individuals proceeded approximately 2.5 miles, going from Zuccotti Park to the East Village.

47.     Throughout, all participants behaved peacefully.

48.     The Plaintiffs respected and obeyed applicable traffic laws.

49.     The Plaintiffs complied with all police orders.

50.     Members of the NYPD, including the Defendant POLICE OFFICERS, accompanied the participants.

51.     By the time the Plaintiffs had reached Ninth Street just west of Second Avenue, the accompanying Defendant POLICE OFFICERS had given tacit approval for this group of individuals to walk together on the sidewalk.

52.     This tacit approval was evidenced by the accompanying Defendant POLICE OFFICERS facilitating the direction of the group.

53.     This tacit approval was evidenced by the accompanying Defendant POLICE OFFICERS facilitating the group staying together at the intersection of Ninth Street and Second Avenue.

54.     As the group walked east towards the northwest corner of Ninth Street and Second Avenue, some of the accompanying Defendant POLICE OFFICERS were ordered to block vehicular traffic on Second Avenue to allow the group to cross Second Avenue as one group regardless of traffic lights.

55.     As the group entered the northern crosswalk of Second Avenue and Ninth Street traveling in an easterly direction towards First Avenue, at least six NYPD vehicles were parked on Second Avenue blocking traffic.

56.     Video of this moment recorded by the NYPD's Technical Assistance Response Unit ("TARU") shows that the entire group of individuals was kept together by the direction and facilitation of the NYPD, and the use of NYPD vehicles with flashing lights parked in the roadway of Second Avenue at the northern part of the Ninth Street crossway.

57.     TARU video of this moment indicates that there were 2 Police Vans, 1 Black SUV, 1 Black Town Car and 1 marked NYPD cruiser, parked on the roadway of Second Avenue just north of the Ninth Avenue intersection.

58.     TARU video of this moment indicates that the marked NYPD cruiser was in the East lane of Second Avenue just north of the Ninth Avenue intersection.

59.     TARU video of this moment indicates that there were two marked NYPD vans in the middle lane of Second Avenue, one in front of the other, with at least one of these vans having their bubble lights flashing, just north of the Ninth Avenue intersection.

60.     TARU video of this moment indicates that there were two additional, unmarked NYPD vehicles with flashing lights parked in the west lane of Second Avenue just north of the Ninth Street intersection.

61.     TARU video of this moment shows at least three high ranking members of the NYPD present at the intersection of Second Avenue and Ninth Street, including one officer wearing two stars on his shoulder, and one officer that is believed to be Defendant CHIEF HALL.

62.     Soon after crossing this intersection, the group initially continued east on Ninth Street, eventually turning back towards the north-east corner of Ninth Street and Second Avenue.

63.     At the north-east corner of Ninth Street and Second Avenue, the NYPD held the individuals for a few minutes at this corner without allowing them to proceed in any direction.

64.     After a few minutes, the officers, including at least three high-ranking officers of the NYPD identifiable by the gold leaf stripe on their NYPD caps, instructed the individuals to continue walking north on Second Avenue.

65.     A few blocks later, when the individuals, including the Plaintiffs, reached 13th Street and Second Avenue, the police, including the Defendant POLICE OFFICERS, blocked the south-east intersection of 13th Street and 2nd Avenue.

66.     The police, including the Defendant POLICE OFFICERS, blocked the participants from making further forward progress in a northerly direction on Second Avenue.

67.     The police, including the Defendant POLICE OFFICERS, blocked the sidewalk behind the participants so that they could not return in a southerly direction down Second Avenue.

68.     The police, including the Defendant POLICE OFFICERS, also blocked the participants from leaving the sidewalk by exiting into the street.

69.     Thus, the police, including the Defendant POLICE OFFICERS, completely prevented the participants from dispersing.

70.     Nevertheless, one or more police officers, including the Defendant POLICE OFFICERS, ordered certain of the participants to disperse.

71.     The participants could not comply with the Defendant POLICE OFFICERS' orders to disperse because the police, including the Defendant POLICE OFFICERS, physically blocked them from doing so.

72.     The Defendant POLICE OFFICERS arrested the participants, including the Plaintiffs.

73.     Upon information and belief, Plaintiff JENNIFER PEAT ("Plaintiff PEAT") was arrested by Defendant POLICE OFFICER MONROE.  Defendant SERGEANT MILLER supervised Plaintiff PEAT's arrest, and Defendant POLICE OFFICER MONROE entered Plaintiff PEAT's arrest report.

74. Upon information and belief, Plaintiff PEAT was arrested as a result of allegations by Defendant DEPUTY INSPECTOR MULLIGAN that Plaintiff PEAT violated P.L. §240.20(6).

75. These allegations were false -- Plaintiff PEAT did not violate P.L. §240.20(6), nor did she commit any other violation or crime.

76. Upon information and belief, Plaintiff JEFFERSON MEIGHAN JR. ("Plaintiff MEIGHAN JR.") was arrested by Defendant POLICE OFFICER FITTERMAN. Defendant SERGEANT MILLER supervised Plaintiff MEIGHAN JR.'s arrest, and Defendant POLICE OFFICER LAURIA entered Plaintiff MEIGHAN JR.'s arrest report.

77. Upon information and belief, Plaintiff MEIGHAN JR. was arrested as a result of allegations by Defendant DEPUTY INSPECTOR MULLIGAN that Plaintiff MEIGHAN JR. violated P.L. §240.20(6).

78. These allegations were false -- Plaintiff MEIGHAN JR. did not violate P.L. §240.20(6), nor did he commit any other violation or crime.

79. Upon information and belief, Plaintiff ELAN COHEN was arrested by Defendant POLICE OFFICER PERKINS. Defendant SERGEANT TORRES supervised Plaintiff COHEN's arrest, and Defendant POLICE OFFICER GUZMAN entered Plaintiff COHEN's arrest report.

80. Upon information and belief, Plaintiff COHEN was arrested as a result of allegations by Defendant CAPTAIN TAYLOR that Plaintiff COHEN violated P.L. §240.20(6).

81.     These allegations were false -- Plaintiff COHEN did not violate P.L. §240.20(6), nor did he commit any other violation or crime.

82.     Upon information and belief, Plaintiff GARRETT O'CONNOR ("Plaintiff O'CONNOR") was arrested by Defendant POLICE OFFICER ELIAV.  Defendant SERGEANT MILLER supervised Plaintiff O'CONNOR's arrest, and Defendant POLICE OFFICER ELIAV entered Plaintiff O'CONNOR's arrest report.

83.     Upon information and belief, Plaintiff O'CONNOR was arrested as a result of allegations by Defendant DEPUTY INSPECTOR MULLIGAN that Plaintiff O'CONNOR violated P.L. §240.20(6).

84.     These allegations were false -- Plaintiff O'CONNOR did not violate P.L. §240.20(6), nor did he commit any other violation or crime.

85.     Upon information and belief, Plaintiff BRENDON SULLIVAN-MONSON ("Plaintiff SULLIVAN-MONSON") was arrested by Defendant POLICE OFFICER BREHM.  Defendant SERGEANT GIAMBRONE supervised Plaintiff BRENDON SULLIVAN-MONSON's arrest, and Defendant SERGEANT CAFARO entered Plaintiff SULLIVAN-MONSON's arrest report.

86.     Upon information and belief, Plaintiff SULLIVAN-MONSON was arrested as a result of allegations by Defendant POLICE OFFICER KONTARINIS that Plaintiff SULLIVAN-MONSON violated P.L. §240.20(6).

87.     These allegations were false -- Plaintiff SULLIVAN-MONSON did not violate P.L. §240.20(6), nor did he commit any other violation or crime.

88.     Upon information and belief, Plaintiff ATHENA SOULES ("Plaintiff SOULES") was arrested by Defendant POLICE OFFICER POLANCO, allegedly for

violation of P.L. §240.20(5)&(6).  Defendant SERGEANT FERRIGNO supervised Plaintiff SOULES' arrest, and Defendant POLICE OFFICER GALVIN entered Plaintiff SOULES' arrest report.

89.     Plaintiff SOULES did not violate either subsection P.L. §240.20(5)&(6), nor did she commit any other violation or crime.

90.     Upon information and belief, Plaintiff SAMANTHA ALLEGRA FRIERSON ("Plaintiff FRIERSON") was arrested by Defendant POLICE OFFICER MONROE.  Defendant SERGEANT MILLER supervised Plaintiff FRIERSONS's arrest, and Defendant POLICE OFFICER MONROE entered Plaintiff FRIERSON's arrest report.

91.     Upon information and belief, Plaintiff FRIERSON was arrested as a result of allegations by Defendant DEPUTY INSPECTOR MULLIGAN that Plaintiff FRIERSON violated P.L. §240.20(1).

92.     These allegations were false -- Plaintiff FRIERSON did not violate P.L. §240.20(1), nor did she commit any other violation or crime.

93.     Upon information and belief, Plaintiff ZACHARY CUNNINGHAM ("Plaintiff CUNNINGHAM") was arrested by Defendant POLICE OFFICER ELIAV. Defendant SERGEANT MILLER supervised Plaintiff CUNNINGHAM's arrest, and Defendant POLICE OFFICER ELIAV entered Plaintiff CUNNINGHAM's arrest report.

94.     Upon information and belief, Plaintiff CUNNINGHAM was arrested as a result of allegations by Defendant DEPUTY INSPECTOR MULLIGAN that Plaintiff CUNNINGHAM violated §P.L. §240.20(6).

95.     These allegations were false -- Plaintiff CUNNINGHAM did not violate P.L. §240.20(6), nor did he commit any other violation or crime.

96.     Upon information and belief, Plaintiff NEGESTI CANTAVE ("Plaintiff CANTAVE") was arrested by Defendant POLICE OFFICER MONROE.  Defendant SERGEANT MILLER supervised Plaintiff CANTAVE's arrest, and Defendant MONROE entered Plaintiff CANTAVE's arrest report.

97.     Upon information and belief, Plaintiff CANTAVE was arrested as a result of allegations by Defendant CAPTAIN TAYLOR that Plaintiff CANTAVE violated P.L. §240.20(6).

98.     These allegations were false -- Plaintiff CANTAVE did not violate P.L. §240.20(6), nor did she commit any other violation or crime.

99.     Upon information and belief, Plaintiff ELIZABETH ARCE ("Plaintiff ARCE's") was arrested by Defendant POLICE OFFICER MONROE.  Defendant SERGEANT MILLER supervised Plaintiff ARCE's arrest, and Defendant POLICE OFFICER MONROE entered Plaintiff <u>ARCE's</u> arrest report.

100.    Upon information and belief, Plaintiff ARCE was arrested as a result of allegations by Defendant CAPTAIN TAYLOR and Defendant DEPUTY INSPECTOR MULLIGAN that Plaintiff ARCE violated P.L. §240.20(5)&(6).

101.    These allegations were false -- Plaintiff ARCE did not violate either subsection of P.L. §240.20(5)(6), nor did she commit any other violation or crime.

102.    Upon information and belief, Defendant CHIEF HALL, Defendant CAPTAIN GARDNER, Defendant LIEUTENANT BESSLER, and Defendant POLICE

OFFICER KONTARINIS were participants throughout some or all of Defendants' arrests of Plaintiffs.

103.    Upon information and belief, Defendant CHIEF HALL, Defendant CAPTAIN GARDNER, Defendant LIEUTENANT BESSLER, and Defendant POLICE OFFICER KONTARINIS were present throughout some or all of Defendants' arrests of Plaintiffs and failed to intervene so as to prevent Defendants' violations of Plaintiffs' Constitutional Rights in the manner described herein.

104.    At the time and place that the Plaintiffs were being arrested, one or more of the Defendant POLICE OFFICERS stated, in sum and substance, that the Plaintiffs were being arrested because they were marching.

105.    Upon information and belief, the Defendant POLICE OFFICERS' statement evidences the intent of the police, including Defendant POLICE OFFICERS, to infringe upon Plaintiffs' lawful exercise of their First Amendment Protected rights.

106.    Those arrested, including the Plaintiffs, were handcuffed and taken to the 9th Precinct.

107.    There, the Plaintiffs were held for several hours.

108.    The Plaintiffs were photographed.

109.    The Plaintiffs were issued Desk Appearance Tickets ("DATs").

110.    The Plaintiffs were compelled to appear in court to dispute the charges.

111.    The New York County District Attorney's Office declined to prosecute.

112.    All charges were dismissed.

113.    As a result of the Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS' conduct, the Plaintiffs have been harmed as follows:

A.     Plaintiffs were deprived of their liberty and freedom.

B.     Plaintiffs were subjected to excessive force.

C.     Plaintiffs suffered damage to their standing and reputations within their communities.

D.     Plaintiffs suffered physical, mental, and emotional injuries.

**114.**   As a result of the foregoing, Plaintiffs have also sustained a deprivation of their constitutional rights.

**115.**   As a result of the foregoing, Defendant THE CITY OF NEW YORK is also liable for the conduct of the Defendant POLICE OFFICERS under a theory of *Respondeat Superior*.

**116.**   As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**117.**   Plaintiffs also demand relief in the form of punitive damages against the individual Defendant POLICE OFFICERS as well as against the Defendant THE CITY OF NEW YORK.

<u>**FIRST CLAIM FOR RELIEF**</u>

<u>**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**</u>

**118.**    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**119.**   All of the aforementioned acts of the Defendant THE CITY OF NEW YORK, and the Defendant POLICE OFFICERS and their agents, servants and employees, were carried out under the color of state law.

120.     All of the foregoing acts by Defendants deprived Plaintiffs of federally protected rights, including, but not limited to, the right:

      A.     Not to be deprived of liberty without due process of law;

      B.     To be free from seizure and arrest not based upon probable cause;

      C.     To freedom from being subjected to false criminal charges by the police;

      D.     To freedom from excessive force being used upon them;

      E.     To freedom from retaliatory prosecution;

      F.     To freedom from abuse of process;

      G.     To freedom of speech and expression; and

      H.     To receive equal protection under the law.

121.     All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

122.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

123.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**124.**   As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF

## FALSE ARREST UNDER 42 U.S.C. § 1983

**125.**   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**126.**   As a result of the aforesaid conduct by the Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, Plaintiffs were subjected to illegal, improper and false arrests by the Defendants and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

**127.**   As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF

## EXCESSIVE USE OF FORCE UNDER 42 U.S.C. §1983

**128.**   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

129.     As a result of the aforesaid conduct by the Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, Plaintiffs were unnecessarily handcuffed by the Defendant POLICE OFFICERS.

130.     Plaintiffs were unnecessarily manhandled, pushed, and confined.

131.     Plaintiffs were unnecessarily transported to the 9th Precinct by the Defendant POLICE OFFICERS.

132.     Plaintiffs were transported to One Police Plaza by the Defendant POLICE OFFICERS in the absence of probable cause for their arrest.

133.     The circumstances presented to the Defendant POLICE OFFICERS at that time did not support any of the above applications of force on Plaintiffs.

134.     Plaintiffs were subjected to excessive force by the Defendant POLICE OFFICERS, in violation of their rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

135.     As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

136.     Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

137.     The Defendant POLICE OFFICERS had an affirmative duty to intervene on Plaintiffs' behalf to prevent the violation of their constitutional rights.

**138.**    The Defendant POLICE OFFICERS failed to intervene on Plaintiffs'

behalf in order to prevent the violation of their constitutional rights despite having had a

realistic opportunity to do so.

**139.**    The Defendant POLICE OFFICERS failed to intervene on Plaintiffs'

behalf in order to prevent the violation of their constitutional rights despite having

substantially contributed to the circumstances within which Plaintiffs' rights were

violated by The Defendant POLICE OFFICERS' affirmative conduct.

**140.**    The Defendant POLICE OFFICERS failed to intervene on Plaintiffs'

behalf in order to prevent the violation of Plaintiffs' constitutional rights despite the

Defendant POLICE OFFICERS' awareness that Plaintiffs rights were being violated.

**141.**    As a result of the aforementioned conduct of the individual defendants,

Plaintiffs' constitutional rights were violated.

**142.**    As a result of Defendants' impermissible conduct, Plaintiffs were injured

and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of

money to be determined at trial.

### FIFTH CLAIM FOR RELIEF

### RETALIATION FOR FIRST AMENDMENT
### PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983

**143.**    Plaintiffs repeat, reiterate, and re-allege each and every allegation

contained in the above paragraphs with the same force and effect as if fully set forth

herein.

**144.**    At or around the time that Plaintiffs came into contact with the Defendant

POLICE OFFICERS, Plaintiffs' had recently been and/or were currently engaging in

protected speech or conduct, including but not limited to participating in a peaceful assembly in order to lawfully exercise their First Amendment protected rights.

145.    The Defendants took adverse action against Plaintiffs in order to punish them for engaging in protected speech and conduct.

146.    The Defendants took adverse actions against Plaintiffs by using wrongful and unjustified force upon Plaintiffs.

147.    The Defendants took adverse action against Plaintiffs by unlawfully arresting them.

148.    The Defendants took adverse action against Plaintiffs by arresting them despite the absence of probable cause to do so.

149.    The Defendants took adverse action against Plaintiffs by falsely accusing them of crimes and violations.

150.    The Defendants took adverse action against Plaintiffs by taking them into Police custody and detaining them against their will.

151.    Upon information and belief, there was a causal connection between the protected speech and conduct engaged in by Plaintiffs and the adverse actions taken by the Defendants.

152.    The causal connection between the protected speech and conduct engaged in by Plaintiffs and the adverse actions taken against them by the Defendants was demonstrated by, among other things, the fact that one or more of the Defendant POLICE OFFICERS stated to Plaintiffs, in sum and substance that the Plaintiffs were being arrested because they were marching, at or around the time that the Defendant POLICE OFFICERS arrested Plaintiffs.

**153.**   Plaintiffs were taken into police custody and detained against their will.

**154.**   Defendants deprived Plaintiffs of their liberty in violation of both their civil and constitutional rights, as guaranteed under 42 U.S.C. §1983 and set forth in the United States Constitution's First, Fourth, Fifth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for their exercise of their civil and constitutional rights of free speech, free expression, and expressive association.

**155.**   Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the Plaintiffs' constitutional rights.

**156.**   As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer loss of liberty, deprivation their freedom to peaceably assemble, deprivation of their freedom of expression, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

**157.**   As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### SIXTH CLAIM FOR RELIEF

### MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. §1983
_____

**158.**   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**159.**    Defendant THE CITY OF NEW YORK has established policies and customs pursuant to which the NYPD and its members, including the Defendant POLICE OFFICERS, have violated the constitutional rights of the Plaintiffs.

**160.**    The Defendant POLICE OFFICERS, and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**161.**    The general approach of the NYPD to the Occupy Wall Street protests fits a paradigm named by scholars "the escalated force approach," which includes the following: limited concern for the protesters' speech and assembly rights; limited tolerance for community disruption; limited communication between police and demonstrators; extensive use of arrests to manage demonstrators; extensive use of force to control demonstrators; and surveillance of protesters, including infiltration and the use of informants.[1]  All of the forgoing tactics have been reported being implemented by the NYPD on multiple occasions in policing Occupy-related events, including the illegal mass arrests described herein.

**162.**    Particular policies and customs implemented by Defendant THE CITY OF NEW YORK which proximately caused violation of the Plaintiffs' Constitutional rights are these:

---

[1]    *See Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street,* The Global Justice Clinic (NYU School of Law) and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice (Fordham Law School) (2012).

A. The City of New York has a policy and practice of targeting participants in Occupy Wall Street activities for arrest without cause.

B. The City of New York has a policy or practice of failing or neglecting to discipline officers that are guilty of misconduct, including wrongful arrests, perjury, and excessive force.

C. The City of New York has a policy and practice of engaging mass arrests of protestors without individualized probable cause for arrest.

D. The City of New York has a policy and practice of arresting individuals selected at random from within groups engaging in peaceful protest, for the purpose of frightening and deterring the remainder of those protesting.

E. The City of New York has a policy and practice of unlawful use of "trap and detain"/"trap and arrest" tactics, in which the police detain and numerous individuals by enclosing the area in which they are located, without permitting those individuals notice or opportunity to leave.

<u>THE CITY OF NEW YORK HAS A POLICY AND PRACTICE OF TARGETING PARTICIPANTS IN OCCUPY WALL STREET ACTIVITIES FOR ARREST WITHOUT CAUSE</u>

**163.** According to *The New York Times*, as of June 18, 2012, over 2,500 participants in Occupy Wall Street activities had been arrested in Manhattan alone. Upon information and belief, the vast majority of the cases were dismissed or otherwise resolved without criminal penalty.

27

164.     In other words, over the period of less than a year, Defendant THE CITY OF NEW YORK caused hundreds or thousands of protestors – who had committed no crime -- to be arrested.

165.     Upon information and belief, the NYPD's response to the Occupy movement follows mass arrest policies that were established at the time of the 2004 Republican convention, during which over 1,800 people were arrested, with more than 90 percent of the arrest cases being dismissed or ending with not-guilty verdicts.

166.     Upon information and belief, the police have been documented to have filed false criminal charges against others – not parties to this action -- who were arrested during the January 1, 2012 Occupy Wall Street march which is the subject of this action.

167.     Upon information and belief, in one such arrest Alexander Arbuckle was arrested on charges that he was standing in the street blocking traffic.  The arresting officer, Officer Elisheba Vera, swore to this version of events on the witness stand at trial.  However, photo and video evidence – including video taken by the NYPD's video unit – demonstrated that Arbuckle was on the sidewalk when he was arrested.  As the magazine *The Nation* reported: "As it turns out, Officer Elisheba Vera lied to the court." Arbuckle was found not guilty.

168.     Upon information and belief, Damien Treffs was a legal observer on January 1, 2012.  He was violently arrested without warning.  The District Attorneys office declined to prosecute the case because probable cause was lacking for the arrest.

169.     Upon information and belief, police officers committed perjury in order to press charges against another protestor, Jessica Hall, who was arrested for blocking street traffic on November 17, 2011.  As *The Nation* reported, the truth exposed at her trial was

28

quite different:  "During trial, Sergeant Michael Soldo told the court that he arrested Hall because she was blocking traffic.  But Soldo later admitted under cross-examination, and the NYPD's own video confirmed, that it was the NYPD metal barricades that prevented vehicles from passing."

170.     Upon information and belief, police lied to support the arrest of a protestor arrested at an Occupy-related protest on Sept. 19, 2011, The protestor was arrested for – according to NYPD spokesman Paul Browne – leaping over a police crowd-control barrier.  Video of the incident, however, showed that the arresting officers reached across the barrier and forcibly dragged the individual over it.

### THE CITY OF NEW YORK FAILS TO ADDRESS THE PROBLEM OF POLICE MISCONDUCT, INCLUDING WRONGFUL ARRESTS, PERJURY, AND EXCESSIVE FORCE

171.     Upon information and belief, neither Sergeant Michael Soldo nor Officer Elisheba Vera have been disciplined or punished in any way for their perjury, committed for the purpose of imposing criminal liability on an Occupy-affiliated protestor.

172.     Upon information and belief, this is consistent with the NYPD's long-standing policy of tolerating perjury if it helps increase the number of arrests and convictions by the NYPD.  After the Honorable Judge Jack B. Weinstein made a finding that police followed a custom or practice of lying under oath, Police Commissioner Raymond Kelly acknowledged to reporters that false testimony by police officers occurs.  As reported by the Daily News on December 1, 2009, Kelly said: "When it happens it's not for personal gain.  It's more for convenience."

**173.** Upon information and belief, Commissioner Kelly and the NYPD did not take any steps whatsoever to address the admitted custom of perjury.  By failing to address this unlawful custom when known, the custom became a policy of the NYPD.

**174.** Upon information and belief, research published by the New York Civil Liberties Union similarly documented thousands of "plain view" marijuana arrests based on false allegations by the arresting officers that the marijuana was in plain view in order to turn a non-criminal violation into a criminal misdemeanor.[2]

**175.** Upon information and belief, in a story published on May 12, 2008, the New York Times documented at least 20 cases in federal court in which police provided false boilerplate testimony to justify searches and seizures of guns.  These cases represented only that small fraction of cases in which the boilerplate testimony could be challenged with more than the word of the defendant.[3]

**176.** Upon information and belief, there have been numerous civil cases filed arising out of perjured criminal complaints.  See, e.g., McMillan v. City of New York, 04 Civ. 3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion); Avent v. City of New York, 04 Civ. 2451 (CBA) (CLP) (E.D.N.Y.) (same); Smith v. City of New York, 04 Civ. 1045 (RRM) (JMA) (E.D.N.Y.) (same).

---

[2] Levine, Harry G. and Deborah Peterson Small, Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City 1997-2007, New York Civil Liberties Union, April 2008, p. 5.

[3] Weiser, Benjamin, "Police in Gun Searches Face Disbelief in Court," May 12, 2008.

177.     Upon information and belief, in one especially shocking case, a police officer was so troubled by the rampant illegality he observed by his colleagues, that he began to make audio recordings of his interactions with his peers and superiors at his precinct.  When he exposed the precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges, he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press.  Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.).

178.     Upon information and belief, several civil cases arising out of the arrests of protestors have also alleged perjured criminal complaints lodged against protestors prior to the Occupy movement, including:

♦ Long v. City of New York, 09 Civ. 9216 (AKH) (S.D.N.Y.) (officer purposefully swears out false complaint against protestor; perjury is discovered by means of video of the arrest taken by another protestor);

♦ Callaghan v. City of New York, 07 Civ. 9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and mass retaliatory arrests of bicyclists, not based upon individualized suspicion, engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

♦ Dunlop v. City of New York, 06 Civ. 0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

♦ <u>MacNamara v. City of New York</u>, 04 Civ. 9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people, not based upon individualized suspicion).

179.    Upon information and belief, other cases have documented other forms of police misconduct directed against protestors, and tolerated or encouraged by the NYPD.

♦ <u>Corbin v. City of New York</u>, 12-cv-02305 (PAC) (S.D.N.Y.) (police captain personally engaged in extended surveillance of small group of lawful protestors, eventually directing unlawful arrests of perceived leaders of group).

<u>THE CITY OF NEW YORK HAS A POLICY AND PRACTICE OF ARRESTING
INDIVIDUALS SELECTED AT RANDOM FROM WITHIN GROUPS
ENGAGING IN PEACEFUL PROTEST, FOR THE PURPOSE OF FRIGHTENING
AND DETERRING THE REMAINDER OF THOSE PROTESTING.</u>

180.    Upon information and belief, Defendant THE CITY OF NEW YORK has implemented a policy pursuant to which individuals are selected at random for arrest from within a group of protestors, in order to create fear in other protestors that they too will be subject to arrest.  One feature of random arrests is that the police arrest certain individuals who are engaging in lawful activity, and who are engaging in no legally significant activity that is different from that of other individuals present at the same time and place.  Upon information and belief, the purpose of this tactic is to deter protestors from engaging in protest.  The tactic is effective because it creates confusion as to what conduct the police consider lawful, and what conduct will subject the individual to arrest.

181.    Upon information and belief, this tactic actually achieves the desired result of deterring other individuals from lawful participation in Occupy-related activities.  Arresting even a relatively small proportion of those lawfully engaging in a protest is an

effective deterrent.  If the NYPD regularly arrested every 100th person entering Macy's, people would very quickly stop going to Macy's.  Months and thousands of arrests after the Occupy Wall Street movement began, these abusive tactics have substantially impacted the size and frequency of events.

182.    Upon information and belief, as early as the third day of the Occupy Wall Street protests, NYPD officers were already observed to have been selecting individual protestors at random from a larger group and targeting those people for arrest.  At a protest on Sept. 19, 2011, journalists reported police penetrating a group of protestors to select a single individual for arrest.  The individual was later falsely reported to have leapt over a barricade by NYPD spokesman Paul Browne.

183.    Upon information and belief, two days later, one witness reported two random arrests at an Occupy-related protest at the corner of Broadway and Liberty streets on September 21, 2011.

184.    Upon information and belief, a reporter for the *Chronicle of Higher Education* documented the random arrest tactic being employed in the vicinity of Union Square on September 24, 2011: "In the same way that ocean trawlers capture indiscriminately, officers penned hundreds of peacefully marching Occupy Wall Street protesters together with bystanders, pedestrians, reporters, and neighborhood residents.  Witnesses called police targeting of detainees 'random.'"  The same reporter wrote: "Many detainees were simply on their way from the nearby farmer's market or the Strand bookstore—or en route to one of the five subway lines intersecting in the area."

185.    Upon information and belief, a reporter for *The New York Times* reported that arrests of Occupy-affiliated protestors in the vicinity of the Brooklyn Bridge on

October 1, 2011 appeared to be "random and aggressive."  ABC News similarly reported "random" arrests taking place.  The following day, Mayor Michael R. Bloomberg ratified these tactics stating, "The police did exactly what they were supposed to do."

186.   Upon information and belief, on January 1, 2012, actress Ellen Barkin reported that she witnessed police forcibly arrest a woman near Union Square, who was simply walking in the vicinity of Occupy-affiliated protestors.

187.   Upon information and belief, one journalist described such random arrests occurring at Zuccotti Park on the night of February 28, 2012 in which several Occupy-affiliated citizens present in the park were arrested for no discernable reason, while others, equally innocent, were not.  The journalist recorded the police taunting these people.

188.   Upon information and belief, *The New York Times* reported that protestors engaged in peaceful and lawful protest were being randomly selected for arrest at an Occupy-related protest on March 17, 2012.

189.   Upon information and belief, a New York Times reporter described the police randomly selecting individual non-violent for arrest at an Occupy-related protest in the financial district that occurred on September 15, 2012.

190.   Upon information and belief, a reporter for *Gothamist.com* also reported random arrests during an Occupy-related march from Washington Square to Zuccotti Park on September 15, 2012, and identified such random arrests as a recognizable tactic consistently employed by the NYPD at Occupy-related protests: "NYPD officers in white shirts [were] throwing people into the sidewalk, and … police were singling protesters

out, seemingly at random, to be arrested. The tactic is a hallmark of the NYPD's policing of Occupy Wall Street demonstrations, both large and small."

191.    Upon information and belief, a journalist for *The Atlantic*, reporting on a protest on September 17, 2012, made the same observation: "At times, police seemed to outnumber protesters, and some arrests during the protest seemed random: An officer would point out an individual in the crowd, and then a group [of officers] would rush in and grab the target."  A journalist who was himself arrested while covering this event reported: "NYPD was randomly grabbing people 3-5 at a time throughout the march."

<u>THE CITY OF NEW YORK HAS A POLICY AND PRACTICE OF UNLAWFUL<br>TRAP AND DETAIN/TRAP AND ARREST TACTICS</u>

192.    Defendant THE CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass group arrests of protesters without particularized probable cause for the arrest of any individual within the mass of those arrested, using unlawful trap-and-arrest policing tactics.

193.    The NYPD's trap-and-arrest policing tactic involves the use of police lines against targeted protests in order to trap protesters and others, in the absence of warnings or orders calculated to reach those subject to arrest. As a generalized trap without warning, the tactic captures persons indiscriminately and without regard to the existence of particularized probable cause to arrest.

194.    Through the NYPD's trap-and-arrest tactic, police officers guide or escort demonstrators and exercise control over the conduct of the march in order to subsequently affect a mass arrest of the demonstrators involved.

195.    Though the NYPD's trap-and-arrest tactic, police officers exercise control over the conduct of the march through their physical presence; show of police force and

authority; and through the issuance of orders and directives to individuals within the march.

196.    The NYPD's trap-and-arrest tactic neither provides those arrested with fair notice that they may be subject to arrest nor does it provide any opportunity to comply with any directive.  In short, persons conforming their conduct to the law cannot avoid being caught in a mass false arrest.  The trap-and-arrest tactic also frequently results in the arrest of bystanders.

197.    In the absence of particularized probable cause, mass arrests are random arrests writ large.

198.    Defendant THE CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of tolerating and failing to discipline such unlawful police conduct.

199.    The actions of the Defendant POLICE OFFICERS in the present case were performed pursuant to the foregoing policy, practice and/or custom, and using the trap-and-arrest tactic.

200.    These mass false arrests of peaceful demonstrators were ordered, approved, and ratified by command staff and by NYPD policy makers.

201.    Defendant THE CITY OF NEW YORK has failed to adequately train or instruct the NYPD and its officers, including but not limited to the Defendant POLICE OFFICERS, so as to prevent the foreseeable violation of the clearly established rights of protesters.

202.    The existence of the aforementioned policy, practice and/or custom is demonstrated by the fact that it has been applied on several other recent occasions.

**203.**   Upon information and belief, near Union Square on September 24, 2011, mass arrest tactics were implemented using lines of police and/or orange plastic netting to trap and arrest protestors and anyone else that happened to be in the vicinity.  One reporter for the *Chronicle of Higher Education* who witnessed the scene compared the trap and arrest process to "ocean trawlers" capturing people "indiscriminately."  A reporter for public television reported that some of those arrested were "bystanders who were snatched up while snapping souvenir photos."  One of those arrested was a worker at a University Place café who stepped outside to see what was happening.  The newspaper The Villager reported: "More than 80 people were arrested, including passersby and members of the press."  The same report noted: "As in their previous marches, the demonstrators were peaceful."  Nevertheless, several of those already corralled within plastic netting were pepper-sprayed by NYPD Deputy Inspector Anthony Bologna.  NYPD Commissioner Raymond Kelly later told the press that he was in the area at this time and observed the police activity occurring there.

**204.**   Upon information and belief, Commissioner Kelly's presence at this police activity indicated that he approved and condoned the police activity taking place, including performing mass arrests using the trap and arrest tactic.

**205.**   On October 1, 2011, an Occupy-related protest, accompanied by police, began to cross the Brooklyn Bridge from the Manhattan side by means of the pedestrian walkway.  As the pedestrian walkway filled with people, the police blocked the main entrance ramp to the eastbound lane of the bridge.  After blocking this ramp to both human and vehicular traffic for some time, the police stopped doing so, and the group of officers that blocked the ramp walked up onto the bridge span itself.  The marchers

followed, believing that the police action indicated that the eastbound lane was now available for their use.  When the line of officers reached the approximate halfway point of the bridge span, they stopped and directed the marchers not to continue.  The marchers obeyed this directive.  The police did not permit those on the bridge to leave or otherwise disperse and arrested approximately 700 of the marchers who had followed them onto the bridge.  The following day, Mayor Michael R. Bloomberg ratified these tactics stating, "The police did exactly what they were supposed to do."

206.    On Nov. 15, 2011, NYPD officers converged on Zuccotti Park at 1AM and arrested those present *en masse*, including several credentialed journalists who were attempting to cover the story.

207.    On November 30, 2011, a group of approximately 100 protestors were detained on a sidewalk inside barricades for two hours, without being permitted to leave. While this mass arrest resulted in no-one being taken into custody for further processing, the protestors were not free to leave, and were under arrest while they were detained.

208.    Mass arrests of protestors have been the consistent practice of Defendant THE CITY OF NEW YORK and of the NYPD for many years.

209.    On April 7, 2003, the NYPD conducted a mass arrest of demonstrators who were standing on a midtown sidewalk during a protest against the invasion of Iraq. Without warning, notice or cause, police surrounded the protesters as well as passers-by who happened to be walking on the same sidewalk. Without giving a directive or providing opportunity to disperse or comply with any directive the police indiscriminately arrested everyone trapped within the police line cordon. Kunstler v. City

of New York, Civil Action No. 03-CV-02819-RWS, Southern District of New York

(filed February 11, 2004, terminated August 22, 2008).

210.    Similarly, during the 2004 Republican National Convention in New York

City. According to *The New York Times*, multiple instances of mass arrests occurred.

1,806 persons were arrested in connection with RNC protests, and according to the *Daily*

*News*, "[c]harges were ultimately dropped against 90 percent of them."

211.    Police Commissioner Kelly has explicitly ratified and defended the mass

false arrests of the NYPD, even in response to a Civilian Complaint Review Board letter

which sharply criticized police conduct in connection with two specific RNC mass arrests

and which specifically recommended additional training for officers. Despite these

complaints, Police Commissioner Kelly ratified the arrests stating, "[T]he implication

that the N.Y.P.D. failed during the R.N.C. turns truth on its head." Police Commissioner

Kelly further stated: "The policing of the R.N.C. was one of the Police Department's

finest hours."

212.    Upon information and belief, The New York Times reported that Police

Commissioner Raymond Kelly stated (in relation to the 2004 Republican Convention

protests) that the police are not obligated to give warnings before arrests.  Then and now,

the practice of the NYPD is that officers may arrest peaceful marchers or protestors at

any time.  The NYPD engages in such arrests even where – as in the present case – the

police have accompanied a march and directed the course and direction of the march.

Apart from the present case, on both September 24, 2011 and October 1, 2011, NYPD

officers arrested tens or hundreds of people for marching under the direction of NYPD

officers.

<u>THE FORGOING POLICIES WERE DESIGNED AND IMPLEMENTED AT THE
HIGHEST COMMAND LEVELS OF THE NYPD</u>

213.    Upon information and belief, the foregoing tactics are known and
approved by decision-makers at the highest levels of the NYPD.  A report on police
response to the Occupy movement was compiled by a joint project of *New York
University Law School's Global Justice Clinic* and the *Walter Leitner International
Human Rights Clinic at the Leitner Center for International Law and Justice*.  The report
documented 130 specific incidents of police misconduct, including several of those
mentioned above.  In a letter to the authors, NYPD Assistant Deputy Commissioner
Thomas Doepfner, writing on behalf of the NYPD concerning the report, stated:  "It is
our view, however, that the police actions that have been taken in connection with
Occupy Wall Street activities have been lawful."

214.    Upon information and belief, Police Commissioner Raymond Kelly
personally supervised the arrests that took place near Union Square on September 24,
2011.

215.    Upon information and belief, Police response to Occupy-related activity is
coordinated at the highest levels on the NYPD.  NYPD executives above the level of
precinct commanders controlled the policing of Occupy-related events, using borough
task forces to do the job.

<u>THE CITY OF NEW YORK FAILS TO DISCIPLINE OFFICERS THAT ARE
GUILTY OF MISCONDUCT, INCLUDING WRONGFUL ARRESTS, PERJURY,
AND EXCESSIVE FORCE.</u>

216.    Upon information and belief, while there are thousands of instances of police perjury in criminal complaints and court testimony placing citizens at risk of wrongful imprisonment and other penalties, Defendant THE CITY OF NEW YORK and the NYPD have done nothing to systematically document the problem, and police are rarely or ever disciplined for the practice.  In fact, Commissioner Raymond Kelly excused and failed to correct such perjury.

217.    Upon information and belief, Defendant THE CITY OF NEW YORK and the NYPD have done nothing to systematically document the problem of excessive force or wrongful arrest.  Individual officers are almost never given meaningful discipline for infractions.

218.    Upon information and belief, the NYPD takes no disciplinary action whatsoever against nearly 30% of officers named in substantiated CCRB complaints, and gave only "instructions" to nearly a third of officers who were disciplined following substantiated CCRB complaints between 2000 and 2005.

219.    Both Raymond Kelly and Mayor Bloomberg have explicitly praised and ratified the tactics, including mass arrests without particularized probable cause, engaged in by the NYPD.

220.    The tactics of mass arrests without particularized probable cause, random arrests, perjury for the purposes of supporting arrests and/or criminal complaints are so widespread and of such long duration, and so many thousands of individual officers and citizens have been implicated or affected, that Defendant THE CITY OF NEW YORK must be presumed to be aware of them and to have condoned or promulgated those practices.

**221.**     As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer loss of liberty, deprivation their freedom to peaceably assemble, deprivation of their freedom of expression, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

**222.**     As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

## FALSE IMPRISONMENT AND ARREST UNDER NEW YORK STATE LAW

_____

**223.**     Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**224.**     As a result of the aforesaid conduct by Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, Plaintiffs were unlawfully detained and confined.

**225.**     The Defendant POLICE OFFICERS —— in performance of their duties with powers and authorities designated upon then by Defendant THE CITY OF NEW YORK —— intentionally confined Plaintiffs.

**226.**     Plaintiffs were at all times consciously aware of their confinement by the Defendant POLICE OFFICERS.

**227.** At no point throughout Plaintiffs' unlawful detention and confinement by the Defendant POLICE OFFICERS did Plaintiffs consent to said confinement.

**228.** At no point throughout Plaintiffs' unlawful detention and confinement by the Defendant POLICE OFFICERS were the actions of the Defendant POLICE OFFICERS otherwise privileged.

**229.** As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### EIGHTH CLAIM FOR RELIEF

### BATTERY UNDER NEW YORK STATE LAW
### AGAINST THE DEFENDANT POLICE OFFICERS

**230.** Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**231.** The Defendant POLICE OFFICERS committed battery upon Plaintiffs in their acts of making bodily contact with Plaintiffs by handcuffing them in the absence of probable cause to arrest.

**232.** The Defendant POLICE OFFICERS performed these acts of making bodily contact with Plaintiffs with the intent to do so.

**233.** The Defendant POLICE OFFICERS' acts of making bodily contact with Plaintiffs were subjectively offensive in nature to Plaintiffs.

234.    The Defendant POLICE OFFICERS' acts of making bodily contact with Plaintiffs would be objectively offensive in nature to a reasonable person aware of the circumstances of Plaintiffs' arrests.

235.    The Defendant POLICE OFFICERS performed these acts of making bodily contact with Plaintiffs without privilege or consent from Plaintiffs.

236.    As a result of the Defendant POLICE OFFICERS' conduct, Plaintiffs suffered emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

237.    As a result of the Defendant POLICE OFFICERS' conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## NINTH CLAIM FOR RELIEF

## DEPRIVATION OF PLAINTIFFS' RIGHTS AS GUARANTEED BY THE NEW YORK STATE CONSTITUTION

238.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

239.    As a result of the aforesaid conduct of Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, Plaintiffs were deprived of rights guaranteed to them by the New York State Constitution, including though not limited to:

    A.    The right of the people to freely speak their sentiments on all subjects as described in Article I §8 of the New York State Constitution.

    B.    The right of the people to peaceably assemble to petition the government, or any department thereof as described in Article I §9

Subsection 1 of the New York State Constitution.

C. The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures as described in Article I §12 of the New York State Constitution.

240. The acts complained of were carried out by the Defendant POLICE OFFICERS in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the NYPD.

241. The Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law violated Plaintiffs' constitutional rights by engaging in conduct proscribed by the New York State Constitution.

242. As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**TENTH CLAIM FOR RELIEF**

**NEGLIGENCE UNDER NEW YORK STATE LAW AGAINST DEFENDANT THE CITY OF NEW YORK**
_____

243. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

244. Defendant THE CITY OF NEW YORK was negligent in the hiring and retention of the Defendant POLICE OFFICERS as follows:

A.     Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the hiring and retention of the Defendant POLICE OFFICERS who conducted and participated in the acts of subjecting Plaintiffs to battery, excessive force, and violations of their constitutional rights in the manners described herein.

B.     Defendant THE CITY OF NEW YORK knew, or should have known in the exercise of reasonable care, the propensities of the aforesaid Defendant POLICE OFFICERS to engage in the wrongful conduct heretofore alleged in this complaint.

245.   Defendant THE CITY OF NEW YORK was negligent in the training and supervision of the Defendant POLICE OFFICERS as follows:

A.     Defendant THE CITY OF NEW YORK knew or should have known that the requirements, guidelines, and terms of its training for the Defendant POLICE OFFICERS were insufficient and inadequate to prevent the Defendant POLICE OFFICERS from engaging in the wrongful conduct heretofore alleged in this complaint.

246.   Defendant THE CITY OF NEW YORK is also liable to Plaintiffs on the basis of *respondeat superior* as a result of the constitutionally-impermissible actions of the Defendant POLICE OFFICERS as described herein.

247.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**ELEVENTH CLAIM FOR RELIEF**

***RESPONDEAT SUPERIOR* UNDER NEW YORK STATE LAW AGAINST DEFENDANT THE CITY OF NEW YORK**

248.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

249.    The police officers that detained and arrested the plaintiffs, and who committed the other wrongs against the plaintiffs described herein, whether named individual herein or not, were employees of Defendant THE CITY OF NEW YORK.

250.    At all relevant times, these police officers were acting within the scope of their employment and on behalf of Defendant THE CITY OF NEW YORK.

251.    Defendant THE CITY OF NEW YORK is responsible for the torts of these police officers, and for the consequences of their actions generally, under the theory of *respondeat superior.*

252.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

## SUPERVISORY LIABILITY AGAINST THE RANKING OFFICER DEFENDANTS

**253.** Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**254.** The Ranking Officer Defendants had the duty to supervise their subordinates at the scene of the arrests of the Plaintiffs.

**255.** The Ranking Officer Defendants witnessed their subordinate officers conduct an unlawful mass arrest and did not prevent their subordinates from doing so.

**256.** In fact, upon information and belief, the Ranking Officer Defendants instructed and directed their subordinate officers to conduct the unlawful mass arrest.

**257.** In particular, Defendant CAPTAIN TAYLOR and informed Defendant DEPUTY INSPECTOR MULLIGAN made false allegations to their subordinates that several of the Plaintiffs violated the Penal Law § 240.20, resulting in their arrest.

**258.** The Ranking Officer Defendants acted knowingly and with malice towards the Plaintiffs.

**259.** As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory damages.

[c] Award punitive damages against the individual Defendants.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be proper and in the interests of justice.


DATED:      New York, New York
            June 11, 2013


                              Respectfully submitted,

                              DAVID A. THOMPSON, ESQ. [DT 3991]
                              Stecklow Cohen & Thompson
                              10 SPRING STREET – SUITE 1
                              New York, New York 10012
                              [212] 566-8000
                              [212] 202-4952/FAX
                              ATTORNEY FOR PLAINTIFFS